In the Matter of Vincent LAPIANA
and Barbara Lapiana, Debtors.

Appeal of Millard G. LEE.

No. 89–2736.

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1990.
Decided July 31, 1990.

**222**

Daniel A. Zazove, Karen Walin, Towbin & Zazove, Chicago, Ill., for defendant-appellant.

Karen A. Smith, Dept. of Justice, Tax Div., Washington, D.C., Anton R. Valukas, U.S. Atty., William T. Clabault, Charles E. Ex, Asst. U.S. Atty., Office of the U.S. Atty., Chicago, Ill., Gary R. Allen, Debra J. Stefanik, Jonathan S. Cohen, Deborah Swann, Howard M. Soloman, U.S. Dept. of Justice, Tax Div., Washington, D.C., Victoria S. Crosley, I.R.S., Chicago, Ill., for I.R.S.

Allan J. DeMars, Spiegel & DeMars, Chicago, Ill., for defendants.

Joseph E. Cohen, Cohen & Cohen, Chicago, Ill., for debtors.

Before WOOD, Jr., CUDAHY, and POSNER, Circuit Judges.

POSNER, Circuit Judge.

■ The principal question raised by this appeal is whether *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), completely extinguishes the power of a bankruptcy judge to abate an award of post-petition interest to an oversecured creditor, in this case the United States. We answer "no" but uphold the district judge's ruling that the power was improperly exercised in this case.

The story begins in 1980, when the government filed notices of federal tax lien against two commercial properties owned by the Lapianas. The unpaid balance of the assessments underlying the lien was $70,000 (we round off all dollar figures to the nearest $1,000). A few months earlier Millard Lee, the appellant, had filed a lien against the same properties—a lien junior to the government's tax lien—to secure a large judgment that Lee had obtained against the Lapianas. In 1981 the Lapianas declared bankruptcy, and the bankruptcy judge authorized the sale of one of the properties secured by the federal tax lien and by Lee's judgment lien. The sale realized $74,000, after satisfaction of the mortgages on the property, to apply toward the payment of the liens. (Apply toward, not pay in full, because with interest on the original assessments continuing to accrue, the government's lien alone exceeded the net proceeds of the sale.) In September 1983 the judge ordered the trustee to pay the proceeds of the sale to the Internal Revenue Service in partial satisfaction of the government's lien. The trustee did not do so until May 1985, some twenty months later, and then all he paid was $60,000. He had embezzled the rest. Shortly afterward the Lapianas' other property was sold, yielding net proceeds of $72,000 to apply to the liens held by the government and by Lee. The government claimed all of these proceeds too. It did so because interest on the outstanding unpaid tax assessments since the filing of the petition for bankruptcy, when computed at the rate (approximately, the Treasury bill rate plus three percent) applicable to underpayment of federal tax, 26 U.S.C. §§ 1274(d), 6621, and added to the outstanding unpaid assessments themselves, exceeded the net proceeds of the second sale, leaving nothing for Lee, the junior lienor.

■ In seeking the interest that had accrued on the unpaid tax assessments since the filing of the petition for bankruptcy, the government was relying on 11 U.S.C. § 506(b), which provides that an oversecured creditor "shall be allowed ... interest on [his] claim." (An oversecured creditor is a creditor whose security interest is

worth more than his claim.) There is no pertinent legislative history, *United States v. Ron Pair Enterprises, Inc., supra,* 109 S.Ct. at 1031 n. 6, but we suppose that the idea behind section 506(b), a provision new in the Bankruptcy Code of 1978, is that until the secured creditor's claim plus interest on it has eaten up the entire value of the security the payment of that interest does not infringe the reasonable expectations of any other creditor. After the value of the security is exhausted he is no longer an *over*secured creditor and the section ceases to be applicable.

The bankruptcy judge rejected the government's argument and held that even if section 506(b) applies to involuntary liens such as a tax lien—an unsettled question at the time of his decision—the government had forfeited its rights under the statute by dragging its feet in collecting the proceeds of the first sale. The district judge reversed. 100 B.R. 998 (N.D.Ill.1989). Noting that *Ron Pair* had held section 506(b) applicable to involuntary liens, such as tax liens, she ruled that even if some equitable power to abate an award of postpetition interest on such liens survived, the bankruptcy judge had abused his discretion in invoking the power here. He had emphasized the government's lack of diligence but had failed to note that Lee had been no more diligent in assuring that the trustee complied with the order to pay the government the net proceeds of the first sale. Lee could if need be have asked the district court to hold the trustee in contempt if the latter disobeyed the order to pay; and while admittedly Lee may not have thought it necessary to press the trustee in this way, because *In re Kerber Packing Co.,* 276 F.2d 245 (7th Cir.1960), had held that the government was not entitled to post-petition interest on its liens, that was a case under the old law, before section 506(b) was enacted. It was therefore a weak reed on which to lean in a case governed by that section.

■ In defending its victory in the district court, the government goes the district judge one better by arguing that never, in any circumstances, may a bankruptcy

court deny or reduce an award of post-petition interest to the government, provided of course that the government is oversecured to the extent of the interest sought. This cannot be right. We put the following case to the lawyer who argued the case for the government. The Internal Revenue Service goes to the trustee and offers to compensate him if he will (1) delay paying proceeds in his possession earmarked for satisfying the IRS's tax liens on the bankrupt's property and (2) conceal the failure to pay from any junior lienors, who, if they got wind of the scheme, might ask the district court to hold the trustee in contempt for refusing to comply with an order to pay. The idea behind the scheme would be to enable the Treasury to earn a high interest rate, at the expense of the junior lienors and other creditors of the bankrupt, on what normally is a safe investment (an embezzling trustee is, we hope, a *rara avis*). Even in such a case, the government's lawyer argued, the bankruptcy judge would be helpless. We do not see why. The doctrine of estoppel, limited though it may be when it is the government that is being sought to be estopped— limited indeed to cases of affirmative misconduct, *United States v. Monroe Service Co.,* 901 F.2d 610, 613 (7th Cir.1990), such as our hypothetical case—is as applicable to claims under section 506(b) of the Bankruptcy Code as to other government claims.

It is true of course that bankruptcy, despite its equity pedigree, is a procedure for enforcing pre-bankruptcy entitlements under specified terms and conditions rather than a flight of redistributive fancy or a grant of free-wheeling discretion such as the medieval chancellors enjoyed (equity itself is no longer a discretionary system in that sense). *Boston & Maine Corp. v. Chicago Pacific Corp.,* 785 F.2d 562, 566 (7th Cir.1986); *Levit v. Ingersoll Rand Financial Corp.,* 874 F.2d 1186, 1197–98 (7th Cir.1989); *Marin v. England,* 385 U.S. 99, 110, 87 S.Ct. 274, 280, 17 L.Ed.2d 197 (1966) (Harlan, J., dissenting). The government's tax claim against the Lapianas is one of those pre-bankruptcy entitlements and section 506(b) specifies one of the terms for enforcing it. But the specification need not

be considered exhaustive. A rigid literalism is not the only alternative to discretionary justice. A statute that says "shall" does not, by its imperative mood, extinguish all defenses. We have no reason to suppose that the statute was intended to cut off the defense of estoppel and we may assume that other defenses, such as the statute of limitations, survive as well. The point of *Ron Pair* was to give involuntary liens parity with voluntary ones so far as the applicability of section 506(b) was concerned, rather than to abolish defenses against claims under that section.

■ But this is not to say that section 506(b) is an invitation to a free-for-all equity-balancing act. That would be a swing to the opposite extreme. We deprecate flaccid invocations of "equity" in bankruptcy proceedings. Creditors have rights, among them the right of oversecured creditors to post-petition interest, and bankruptcy judges are not empowered to dissolve rights in the name of equity. Flexible interpretation designed to allow the judicial interpolation of traditional defenses in a statute silent on defenses is one thing; standardless decision-making in the name of equity is another. *Ron Pair* makes clear that section 506(b) provides more than merely "guidance in the exercise of [the bankruptcy court's] equitable powers." 109 S.Ct. at 1034. If the statute were read merely to authorize the bankruptcy judge to award post-petition interest as a matter of grace, secured creditors would lack a clear idea of what their rights would be if the debtor went broke.

■ An equity free-for-all and enforcement of the statute according to its terms subject only to well-recognized defenses such as estoppel and statute of limitations are not the only alternatives. Another possibility would be to create a new equitable defense: lack of due diligence by senior lienors. Equitable defenses need not be limited to equitable claims, *Jones v. Transohio Savings Ass'n*, 747 F.2d 1037, 1039–40 (6th Cir.1984); *Piper Aircraft Corp. v. Wag–Aero, Inc.*, 741 F.2d 925, 939 (7th Cir.1984) (concurring opinion), as noted with reference to bankruptcy in *In re Sa-* *lem Mortgage Co.*, 50 B.R. 34, 41 (Bankr.E.D.Mich.1985), rev'd on other grounds, 783 F.2d 626 (6th Cir.1986). So even if we disregard completely, as perhaps we should not, cf. *United States v. Ron Pair Enterprises, Inc.*, *supra*, 109 S.Ct. at 1034, bankruptcy's equitable origins, we might still be able to recognize an equitable defense of want of due diligence to a claim for post-petition interest. And there can be no doubt that the Internal Revenue Service displayed a lamentable lack of diligence when, months after the trustee had been ordered to pay it $74,000, nothing had happened yet it raised no protest. We were told at argument that the lawyer handling the case for the government resigned shortly after the order to pay was issued. That is an explanation, not an excuse. But there is no suggestion that the government was deliberately stalling; nor is this a plausible inference in comparison to bureaucratic elephantiasis. The Treasury bill rate plus three percent is generous, but not princely; and the extension of credit to a trustee in bankruptcy is not riskless, as this case shows. So the elements of estoppel against the government have not been shown; and to create a new equitable defense that would be merely a watered-down version of equitable estoppel would circumvent the limitations that the courts have placed on the use of estoppel doctrines against the government.

That is one objection to creating a new equitable defense for this case; another is that it would complicate the law needlessly by requiring a searching and often inconclusive inquiry into the relative fault of debtor and creditor. This case is a good illustration of the problematics of such a defense. If the government dragged its feet, so, as the district judge remarked, did Lee, for he made no effort to keep track of whether the trustee had complied with the bankruptcy court's order to pay the government the proceeds of the first sale. He tells us he could not have monitored the trustee's compliance, but does not explain why not. A better point is that he may have had little incentive to do so. Since the Supreme Court had not yet decided *Ron Pair*, it was uncertain whether the govern-

ment was entitled to post-petition interest. The government was claiming it, though, and with some judicial support, illustrated by *In re Busman*, 5 B.R. 332, 338 (Bankr. E.D.N.Y.1980). So it behooved Lee to take the proper steps to stop the interest clock from running. Even if interest is not accruing on senior liens, moreover, the prudent junior lienor will be ever mindful of the importance of clearing senior liens from the property that they encumber. Until the government was paid, its lien would continue in force and Lee could get nothing. He assumed that the proceeds of the first sale would be enough to pay off the government in full, leaving the remaining property free and clear of any liens (except mortgage liens) superior to his own. But like many assumptions this was a dangerous one, as it ignored the government's colorable right to interest.

A further point complicates analysis of the equities in this case. The government's foot dragging began sometime *after* September 1983, for it was not until then that the bankruptcy judge ordered the trustee to pay the government the proceeds of the first sale. By then, however, the unpaid tax assessments *plus post-petition interest to which* Ron Pair *clearly entitles the government* approximated $94,000, no part of which can be abated on the ground of the government's foot dragging. Lee is not content to seek the difference between that amount and the proceeds of the two sales. He seeks the entire proceeds of the second sale. That is overreaching, and rather undermines his equitable claim. He does, it is true, propose in the alternative that the government should at least be denied the full, compound interest to which the statutes applicable to underpayments of federal income tax would otherwise entitle it. The government showed a greater want of care than Lee, and perhaps if this were a pure case of equity balancing that would be enough to give him the partial victory that his fall-back position seeks. But defenses must be crafted with reference to the generality of cases, not the idiosyncratic ones. After *Ron Pair*, junior lienors know they must monitor their seniors' compliance with payment orders, and since they can protect themselves in this way we see no urgent need to complicate the law by creating a new defense of uncertain boundaries and dubious compatibility with the rules on estopping the government.

The Internal Revenue Service would be well advised, however, to institute a procedure for notifying junior lienors of the status of the Service's liens; we were told at argument, without contradiction, that no such procedure exists. The existence of such a procedure would at small cost lighten the burden that we conclude rests on the junior lienor to protect himself from the consequences of section 506(b) and would head off lawsuits such as this. Nevertheless there was no error in the district judge's order reversing the bankruptcy judge and that order is therefore

AFFIRMED.